589 So.2d 950 (1991)
JAMES A. CUMMINGS, INC., and Federal Insurance Company, Appellants,
v.
Bob YOUNG, Appellee.
No. 89-1134.
District Court of Appeal of Florida, Third District.
October 29, 1991.
Rehearing Denied January 3, 1992.
*951 Katz, Barron, Squitero & Faust and William C. Hearon, Miami, and Beth F. Jacobi, West Palm Beach, for appellants.
Catlin, Saxon, Tuttle and Evans and Brian L. Fink and H. James Catlin, Miami, for appellee.
Before HUBBART, COPE and GODERICH, JJ.
PER CURIAM.
The defendants, James A. Cummings, Inc. [Cummings] and Federal Insurance Company [FIC], appeal from a final judgment entered in favor of the plaintiff, Bob Young, Inc. [Young], in this action to recover monies allegedly due Young pursuant to a contractual agreement. We affirm, in part, reverse, in part, and reverse and remand, in part.
On April 1, 1985, Young, a subcontractor, entered into a subcontract agreement [hereinafter referred to as the contract] with Cummings, a general contractor, for the demolition, site work, paving, and installment of storm drain systems at Florida Power & Light Company's [FPL] Miami *952 district office building. The original amount of this contract was for $297,778.00. This amount was later increased to $319,950.00 as a result of several additions and deletions to the project. The contract provided that alterations were to be made only upon Cummings' written orders and that the decisions of the project's architect were to be binding on both Young and Cummings.[1] Under the contract, the architect had final authority to resolve disputes regarding whether tasks were already included within the contract, as well as the reasonableness of any request for extras.[2]
Several disputes arose between Cummings and Young regarding the tasks to be completed at the amount stipulated by the contract. One dispute arose when Cummings instructed Young to remove and relocate certain boulders pursuant to the contract. Despite similar instructions by the architect, Young refused to perform the job unless it received an order increasing the contract amount. Another dispute arose when Cummings accused Young of refusing to grade and fill the east entry to the plaza area of the project. Cummings contends that because of Young's failure to comply with the contract, it was compelled to employ third parties to complete the necessary work, incurring expenses totaling $18,651.00 ($15,159.00 to move boulders; $2,741.00 to grade sidewalks and curbs; and $751.00 to fill curbs). Cummings paid Young a total of $273,066.20 but refused to pay the balance. Cummings also refused to credit Young for additional expenses in the amount of $2,152.00 which Young allegedly incurred in filling and compacting two soakage pits located under the parking garage.
On June 20, 1986, Young filed a claim of lien in the amount of $51,713.53 against the property. On October 6, 1986, Young filed this action against Cummings and FPL[3] to foreclose its mechanic's lien. On October 30, 1986, Cummings filed a surety bond in the amount of $61,122.00, releasing Young's lien. Thereafter, Young filed an amended complaint adding Cummings' surety, FIC, as a defendant. The parties entered into a stipulation setting forth the facts and narrowing the amount in dispute to $20,936.00. This amount represented the $18,651.00 in expenses incurred by Cummings in relocating the boulders and in grading and filling the sidewalks and curbs, plus the $2,152.00 claimed by Young for its unanticipated costs in filling and compacting the two soakage pits, plus the $133.00 attributable to the leasing of certain *953 equipment.[4]
After a non-jury trial, the court found in Young's favor on all issues presented and entered final judgment awarding Young the undisputed sum of $28,232.78 plus the disputed sum of $20,936.00 for an award in the sum of $49,168.78. Additionally, the trial court awarded Young interest in the sum of $15,890.27. Cummings and FIC filed a motion for rehearing and this motion was denied. Thereafter, the trial court entered a final judgment awarding Young $44,000.00 in attorney's fees and costs. Cummings and FIC appeal these decisions.

THE DISPUTED ITEMS
The critical issue is whether the architect ruled on the parties' disputes as required by Article VIII of the contract between the parties. Cummings and FIC contend that the trial court erred in entering the judgment in favor of Young where the architect denied Young's requests for extras in accordance with the express, unambiguous and undisputed terms of the contract. Young, however, contends that the architect merely interpreted the master contract and plan, but did not expressly rule on the question whether the disputed work was already within the scope of the contract.

1. REMOVAL AND RELOCATION OF THE BOULDERS
First, we will examine Cummings' claim for a back charge in the amount of $15,159.00 for relocating the boulders in accordance with the landscaping plans. In accordance with Article VII of the contract, the architect was requested to interpret the plans as they related to the boulders. The architect wrote a letter to Cummings' project manager informing him that the relocation of the existing boulders to specific locations at the job site was referred to and contained in the original architectural drawings attached to the contract. In effect, the architect ruled that Young was obligated to put the boulders in their final locations. In spite of the architect's ruling, Young refused to relocate the boulders unless it was paid an extra for the work.
The trial court allowed testimony as to each party's interpretation of the meaning of paragraph 44 of the contract.[5] Young asserted that remove and relocate meant simply remove and stockpile the boulders at the commencement of the job in order to prepare the site for construction, while Cummings' interpretation would require Young to remove and stockpile the boulders at the commencement of the job and to return at the end of the job to place them in accordance with the landscaping plans. Cummings asserts that the trial court erred in admitting parol evidence when a clear and unambiguous contract exists which contains the parties' entire agreement. We agree. See Peeples Constr. Co. v. Escoe Green, Inc., 522 So.2d 493 (Fla. 1st DCA 1988).
The only issue the trial court should have considered was whether the architect ruled on the issue as required by Article VIII of the contract. The law on this issue is best summarized in material part in 2 Construction and Design Law § 11.7 (1984):
Construction projects frequently provide that, during the course of the project, disputes over the meaning of the contract documents, drawings and specifications will be decided by the architect. These provisions are usually treated like arbitration agreements and are upheld by the courts... .
As a general rule, the architect's interpretation of the contract will be adopted by the court absent a showing of fraud, bad faith or gross mistake on the part of the architect. The parties must, however, *954 have agreed in writing to grant the architect the authority to interpret their contract. The architect's decisions will be binding to the extent that they resolve matters within the grant of authority.
Id. at 80-81.
The law in Florida supports this statement. When parties to a contract agree by its express terms to be bound to the determination made by an architect, that agreement is binding upon the parties. Willcox v. Stephenson, 30 Fla. 377, 11 So. 659 (1892). In the absence of fraud, or such mistake as would amount to fraud, the determination made by the architect shall be final. Id.[6] As previously stated, in the instant case, both parties agreed to be bound by the determination of the architect and agreed that all decisions of the architect would be binding on both parties. Additionally, allegations of fraud were never raised.
For the foregoing reasons, we reverse the trial court's finding that Cummings was not entitled to back charge Young for the money it expended in relocating the boulders in accordance with the landscaping plan. We find that Cummings is entitled to a back charge in the amount of $15,159.00.

2. GRADING AND FILLING THE WALKWAYS
Next, we will address Cummings' claims for back charges in the amounts of $2,741.00 and $751.00 for grading of the wheelchair ramp located between the old and new buildings and for filling the planters in that area, respectively. Cummings' contention is that Young failed to perform the work as directed by Cummings. However, there was substantial, competent evidence introduced at trial to show that Young did not refuse to perform the work.
The architect issued drawing Y-1 in an effort to clarify the sidewalk grading and elevations so it would conform to the applicable handicap codes. The architect denied several of Young's proposals for extra money to perform the work shown on plan Y-1. The architect argued that there was sufficient fill on the site to properly fill the walkway area. Cummings subsequently provided Young with change order number 4. Pursuant to Cummings' and the architect's directive to proceed in accordance with paragraph 55.0 of the general conditions and pursuant to the terms of paragraph 55.0,[7] Young forwarded to Cummings a letter listing the machinery and equipment required to perform the sidewalk grading. However, Cummings ignored Young's compliance with change order number 4 and the architect's directive and hired another contractor to perform the work.
Based on the evidence introduced during the trial, we find that there was competent, substantial evidence to support the trial court's finding that Cummings was not entitled to back charge Young for grading and filling in the sidewalk. See Raheb v. Di Battisto, 483 So.2d 475 (Fla. 3d DCA 1986). Accordingly, we affirm the trial court's award in favor of Young on the grading and filling of the sidewalk area.

3. FILLING AND COMPACTING THE SOAKAGE PITS
We turn next to Young's request for an additional $2,152.00 for labor and material costs incurred in filling and compacting two soakage pits. The soakage pits proved to be sixteen feet deep rather *955 than eight feet deep, as indicated by the plans, specifications, and soil borings provided by FPL. Young testified that the architect denied its request for an extra for the filling of the soakage pits. However, the architect testified that when he drew the plans and wrote the specifications, he did not know how deep the soakage pits were. The architect also testified that if the soakage pit was actually deeper than he had assumed, Young was entitled to the extra.
There is sufficient evidence in the record to support the conclusion that the architect wrongly decided that there should be no extra given for the additional work required to fill the soakage pits. This is an example of gross mistake. See Jacksonville Port Auth. v. Parkhill-Goodloe Co., 362 So.2d 1009 (Fla. 1st DCA 1978). Thus, we find that Young is entitled to the extra costs because the soakage pits proved to be deeper than indicated by the plans, specifications and soil borings provided by FPL. See United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920); Jacksonville Port Auth. v. Parkhill-Goodloe Co., 362 So.2d 1009 (Fla. 1st DCA 1978). Additionally, in Acquisition Corp. of Am. v. American Cast Iron Pipe Co., 543 So.2d 878, 880 (Fla. 4th DCA 1989), the court held that extra work caused by a general contractor's improper site preparation could be recovered by the subcontractor even absent written authorization. For the foregoing reasons, we conclude that the trial court properly found that Young was entitled to an extra for filling and compacting the soakage pits.
In summary, Cummings owes Young the sum of $30,517.78 (the undisputed sum of $28,232.78, $2,152.00 as an extra for work associated with the soakage pits, plus $133.00). However, Cummings is entitled to a set-off in the amount of $15,159.00 which represents the amount Cummings spent for the relocations of the boulders.

PREJUDGMENT INTEREST
Based on our determination of the above damages, we hereby remand this case to the trial court with directions to enter a revised judgment. The trial court shall also refigure the prejudgment interest award.
Despite Cummings' contention to the contrary, we find that the trial court properly awarded Young prejudgment interest on the undisputed sum of $28,232.78. Cummings asserts that the trial court erred in awarding prejudgment interest because Cummings had offered to pay such sum to Young. However, a mere written proposal to pay money is insufficient because it is not an actual offer of tender of money. Lindsay v. Matthews, 17 Fla. 575 (1880). In addition, Cummings conditioned its payment on Young executing a partial release and waiving interest on the amount paid. Such conditions rendered the offer insufficient to preclude the accrual of interest. See Lindsay, 17 Fla. at 575 (evidence of tender must be absolute and unconditional to stop running of interest). We find that Young was right in refusing the partial tender, especially since the instant litigation had already commenced.
Pursuant to section 713.24, Florida Statutes (1987), a judgment on a mechanic's lien bears interest at the legal rate from the date the claim of lien is filed. This court held in Zacco Contractors, Inc. v. Irving Trust Co., 488 So.2d 616 (Fla. 3d DCA 1986), that a subcontractor was entitled to prejudgment interest following foreclosure of its mechanic's lien despite its lack of privity with the lender. Thus, upon remand, the trial court may once again award prejudgment interest on the entire judgment.
Finally, the parties stipulated as to the amount of attorney's fees. However, Cummings' agreement was without prejudice to contest liability. Cummings now raises the question of entitlement to attorney's fees under the mechanic's lien law. In light of our findings, we remand this case to the trial court to determine whether Young is entitled to attorney's fees and, if so, how much.
Affirmed, in part, reversed, in part, and reversed and remanded, in part.
NOTES
[1] Article VII governs the interpretation of the project plan and specifications. It states:

The Work included in this Contract is to be done under the direction and to the satisfaction of both the Architect and Cummings, and the decision of said Architect as to the true construction and meaning of the Plans and Specifications shall be final. Cummings will furnish to the Subcontractor such additional information and Plans as may be prepared by the Architect to further describe the Work to be performed by the Subcontractor and the Subcontractor shall conform to and abide by same insofar as they are consistent with the purpose and intent of the Plans and Specifications referred to in Article I. Cummings shall reserve the right, from time to time, whether the Work or any part thereof shall or shall not have been completed, to make changes, additions and/or omissions in the Work as it may deem necessary, upon written order to the Subcontractor. No such changes, however, shall be made in the Work, except upon written order of Cummings.
Article VIII governs the terms under which change orders, additions, and deductions to the price of the Contract would be made. That Article reads:
No alterations except as provided for in Article VI and VII hereof shall be made in the Work covered by this Contract except upon the written order of Cummings, and when so made the value of the work to be added or omitted shall be stated in said order, and the amount added to or deducted from the Contract price. Should the parties hereto be unable to agree as to the value of such work to be added or omitted, the Subcontractor shall proceed under the written order of Cummings, from which order the stated value of the work shall be omitted, and the determination of the value of the work shall be referred to the Architect, whose decision shall be binding upon both parties hereto.
[2] An "extra" is a request for additional monies for work on a construction job or project that is not contemplated by the terms of the original contract. See Black's Law Dictionary 528 (5th ed. 1979).
[3] On September 9, 1987, FPL was dismissed without prejudice as a defendant.
[4] Cummings does not appeal the trial court's determination that they were liable for the $133.00.
[5] Paragraph 44 of the contract reads as follows:

Demolition includes removal of concrete terrace, footing, concrete canopy, aluminum railing, remove and relocate concrete benches, existing sidewalks, removal only of flagpole, parking lot lighting fixture bases, removal and relocation of existing boulders, sewage lift station (disconnect by Cummings), precast bench, concrete slab fence, concrete curb, ramp, planters, catch-basin, soakage pit and pavement removal.
[6] The Supreme Court has said in Willcox that when the "architect certifies that the work, or any stipulated portion of it, has been done to his satisfaction, and in compliance with the contract, such certificate as to the work included is conclusive upon the owner unless he can avoid it by showing fraud or collusion in its procurement, or such gross misapprehension or mistake as would amount to fraud to permit it to prevail." Id. at 662. See also Restatement Second of Contracts, § 227, Illustration 8, (1981).
[7] Paragraph 55.0 of the general conditions for contract issued by FPL, entitled, "Changes in the Work", provides in pertinent part:

(d) Construction Machinery and Equipment Costs-Charges for construction machinery and equipment shall be determined by using seventy-five (75) percent of the latest revision of the rental rate as stated in the Rental Blue Book for Construction Equipment and as modified for geographical region the equipment is being used. The use of any such construction machinery and equipment shall be subject to the prior approval of FPL.